UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡

**REBA CARTER,**

                             **Plaintiff,**

                 **-v-**                                     **5:00-CV-1744**

**NEW VENTURE GEAR, INC., DAIMLERCHRYSLER CORP., Mike Allen as President of UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA LOCAL 624, Stephen Yokich as President of UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,**

                             **Defendants.**

‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡

APPEARANCES:

K. Felicia Davis, Esq.
P.O. Box 591
Syracuse, New York 13201
Attorney for Plaintiffs

Hancock & Estabrook, LLP
John T. McCann, Esq., of Counsel
Lindsey Helmer Hazelton, Esq., of Counsel
1500 AXA Tower I
Syracuse, New York 13221
Attorneys for Defendants New Venture Gear, Inc.
and DaimlerChrysler Corp.

Blitman & King LLP
Kenneth L. Wagner, Esq., of Counsel
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204
Attorneys for Defendants Mike Allen as President
of United Automobile, Aerospace and Agricultural
Implement Workers of America Local 624, and Stephen
Yokich as President of United Automobile, Aerospace
and Agricultural Implement Workers of America.

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

                           **MEMORANDUM-DECISION AND ORDER**

## INTRODUCTION

In this action alleging racial and sexual discrimination and harassment, there are two motions presently before the Court: first, a motion for summary judgment by defendants New Venture Gear, Inc. and DaimlerChrysler Corp. (collectively, "NVG") (Dkt. No. 101), and second, a motion for summary judgment by defendants Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, and Stephen Yokich as President of United Automobile, Aerospace and Agricultural Implement Workers of America (collectively, "union") (Dkt. No. 103). For the reasons set forth below, the Court grants the motions and dismisses the second amended complaint on the merits.

## SECOND AMENDED COMPLAINT

Plaintiff, an African-American woman, commenced this action on November 15, 2000. In her second amended complaint (Dkt. No. 16), she alleges that during the course of her employment at NVG from July 2, 1984 to October 15, 1999, she suffered racial discrimination, disparate treatment, and racial and sexual harassment. The second amended complaint alleges discriminatory incidents as follows: in April 1999 her department was awarded a bonus, which was shared with everyone but plaintiff; in May 1999 she was reprimanded for making bad parts, although she was not responsible; and in July 1999, despite her seniority, she was moved from her machine job to another job. She further alleges that NVG's conduct has created a system of disparate treatment wherein "incidents reported by Black employees are ignored or not dealt with[, and] ... similarly treated non-Black employees are not treated in such a manner." She avers that she was subjected to racially motivated comments and epithets, physical threats, and assaults by white coworkers, but when she complained to NVG management officials they did not respond or brushed off the incidents as "horseplay." She also claims that she was subjected to sexual

harassment by a supervisor, Mark Trzonkowski. As against the union, of which she was a dues-paying member, plaintiff avers that whenever she requested union representation, the union steward, Gil Odjick, would fail to respond or refuse to provide adequate representation.

The first cause of action is against NVG for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). The second cause of action is against NVG under 42 U.S.C. § 1981 ("section 1981"). The third cause of action is against the union based on section 1981. The fourth and fifth causes of action are against the union for unlawful labor practices under 29 U.S.C. §§ 158 and 185. The remaining causes of action are New York State law claims for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract.

## APPLICABLE LAW

Summary judgment is appropriate "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc*., 448 F.3d 573, 579 (2d Cir. 2006) (internal quotation marks omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

The Local Rules of the Northern District provide a procedural framework for the resolution of summary judgment motions, placing the burden on the parties to present the evidence that either supports or defeats the motion. The movant must first submit a Statement of Material Facts setting forth the undisputed facts upon which it relies and specific citations to the

record where each fact is established.  See N.D.N.Y.L.R. 7.1(a)(3).  The court must satisfy itself that the cited record evidence supports the movant's assertions of fact and that those facts show that the movant is entitled to judgment as a matter of law.  *New York State Teamsters Conf. Pension and Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005).

Once the movant submits a properly supported Statement of Material Facts, the non-moving party must file a response thereto.  "Any facts set forth in the [movant's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."  N.D.N.Y.L.R. 7.1(a)(3).  The Second Circuit has endorsed this rule, noting: "Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties.'" *Id.* (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001)) (alteration in original).

## NVG'S MOTION

**Race discrimination**

As noted, plaintiff alleges three discriminatory incidents.  First, she claims that in April 1999 her department was awarded a bonus, which was shared with everyone but plaintiff. Second, she claims that in May 1999 she was reprimanded for making bad parts, although she was not responsible.  Third, she claims that in July 1999 (the correct date is October 14, 1999), despite her seniority, she was moved from her machine job to another job.

The legal standard applied to claims of race discrimination under Title VII is the same as that applied to section 1981 claims.  The Court analyzes plaintiff's race discrimination claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  The first step requires the plaintiff to prove a *prima facie* case of discrimination by

showing (1) membership in a protected class; (2) possession of basic skills necessary for the job; (3) an adverse employment action; and (4) circumstances giving rise to an inference of race discrimination. *See Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001).

Where a plaintiff has made out a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999). The defendant's burden of production is not a demanding one; it need only offer an explanation for the employment decision. *Id.*

The burden then shifts back to the plaintiff to show "that the proffered reason was not the true reason for the employment decision, and that race was." *Id*. (internal quote omitted). "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then] merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (*i.e.*, that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Id.* at 446-47.

Applying the first step of the *McDonnell Douglas* analysis to the case at bar, the Court notes that NVG does not dispute that plaintiff is a member of a protected class and that she has made the minimal showing needed to satisfy the second element of the test. *See Slattery*, 248 F.3d at 92. Rather, NVG argues that, with respect to all three allegedly discriminatory incidents, plaintiff fails to meet the both the third and fourth elements, because there is no evidence of any adverse employment action, nor is there evidence of any circumstances giving rise to an inference of race discrimination. It further argues that, assuming that plaintiff has made out a *prima facie* case, NVG has met its burden of articulating a legitimate, nondiscriminatory reason for its actions, and that plaintiff has failed to demonstrate that the reason given was not the true reason for the employment decision and that race was. Thus, NVG argues, plaintiff has not met her

ultimate burden of showing that she has been the victim of intentional discrimination.

Addressing first the claim that in April 1999 plaintiff's department was awarded a bonus, which was shared with everyone but plaintiff, defendants adduce an affidavit from Andrew J. Quinn, who was Human Resources Coordinator and then Labor Relations Representative at NVG during the times in question. Quinn's responsibilities included personnel issues such as termination, discipline, labor relations, and benefits, as well as investigating complaints of discrimination and harassment. Quinn agrees that plaintiff did not receive a share of the bonus, but affirms that plaintiff was not entitled to do so. He explains that eligibility depended on the employee's active employment during the time leading up to the bonus, and that plaintiff's absences from work, including an extended absence from October 20, 1998 to March 22, 1999, disqualified her from receiving the bonus. Plaintiff appears to have abandoned this claim on this motion. In any event, plaintiff makes no showing that this action occurred under circumstances giving rise to an inference of discrimination; thus, she fails to make out a *prima facie* case. Moreover, accepting *arguendo* that plaintiff has made out a *prima facie* case, NVG has shown a legitimate non-discriminatory reason for the incident, and plaintiff presents no evidence that the reason is false and that the real reason is discrimination. This claim lacks merit as a matter of law.

With respect to plaintiff's claim that in May 1999 she was reprimanded for making bad parts although she was not responsible, defendants establish by way of Quinn's affidavit that NVG has no record of any such disciplinary action. Even assuming she was given a written reprimand, this without more does not constitute adverse employment action. Plaintiff apparently has abandoned this claim. Plaintiff presents no evidence that the reprimand had any adverse effect on her employment or that it occurred under circumstances giving rise to an inference of

discrimination. Moreover, accepting *arguendo* that plaintiff has made out a *prima facie* case, plaintiff presents no evidence that the reason for the reprimand was racial discrimination. This claim lacks merit as a matter of law.

Third, plaintiff claims that in July 1999, despite her seniority, she was moved from her machine job to another job. Quinn's affidavit shows that the change in plaintiff's job assignment from machine operator to a loading operation occurred not in July 1999, but on October 14, 1999, shortly after her return from an extended disability leave from July 20, 1999 to October 4, 1999.[1] Quinn explains that plaintiff was part of a group working under an incentive system. Plaintiff's supervisor had concerns about her level of production as a machine operator and reassigned her to a loading operation in an effort to increase production for the group. Quinn states that the loading operation was easier, was still within the functions of plaintiff's work group, and took her out of a position where she was holding up production for her group and reducing the group's earnings. According to Quinn, plaintiff's rate of pay was not affected by the change; plaintiff does not claim otherwise. Rather, plaintiff complains about the work-group incentive system itself, which has no bearing on this particular incident and which does not constitute evidence of a racially-discriminatory adverse employment action.[2] As such, plaintiff fails to make out a *prima-facie* case on this claim. Moreover, even accepting *arguendo* that plaintiff has made out a *prima facie* case, NVG has shown a legitimate non-discriminatory reason for the reassignment, and plaintiff presents no evidence that the reason given was false or that the real reason is discrimination. This

---

[1] Quinn states that on October 15, 1999, the day after her reassignment, plaintiff went out on disability leave and never returned to work at NVG.

[2] She also complains about being assigned to sweep, although she testified that she had been given sweeping assignments for years and gave no reason to believe that these assignments were racially motivated.

-7-

claim lacks merit as a matter of law.

**Disparate treatment**

Quinn's affidavit states that at all relevant times NVG employed approximately 3,500 hourly workers, about 600 of whom (17%) were minorities, and that discipline was administered not on the basis of race but on the facts and circumstances of each case. Plaintiff's Statement of Material Facts does not specify what incidents she relies on in support of her claim of disparate treatment. She does relate an incident in which a coworker, Brian Zaccanelli, allegedly threw a brownie which hit her in the back. She compares the brownie incident to one in which Zaccanelli threatened to shoot a white coworker, Joy Fragola, and "threatened to kill everybody and kill her." Certainly, no reasonable factfinder could draw an inference of disparate treatment from the fact that NVG called the police in response to Zaccanelli's threat to shoot everyone but did not call the police in response to his throwing a brownie.

Plaintiff also complains that she and a black coworker, Patricia Glen, reported to management that a white coworker was smoking marijuana on the job, and management did nothing. She does not, however relate comparable incidents involving black employees smoking marijuana, nor is there any other reason to view this as an incident of disparate treatment. NVG has demonstrated that there was no disparate treatment as a matter of law, and plaintiff fails to present evidence to the Court raising a material question of fact on the issue.

**Racial harassment**

*Racial harassment – hostile workplace*

To prevail on a claim of racial harassment based on a hostile work environment, plaintiff must establish: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a

-8-

specific basis exists for imputing the conduct that created the hostile environment to the employer." *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999) (internal quotation marks and citation omitted; alteration in original). The first element of a hostile work environment claim has both an objective and subjective component: "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir.2003) (internal quotation marks and citation omitted). It is obvious that plaintiff perceived the environment to be abusive; thus the Court focuses on evidence regarding whether the work environment could objectively be deemed hostile.

According to NVG, based on Quinn's affidavit, NVG was aware of only two complaints made by plaintiff. In one, she complained that Brian Zaccanelli had thrown a brownie at her, striking her in the back. It is undisputed that no one stated that they had witnessed the incident; nevertheless, according to Quinn, the area manager assembled the whole department and told them that horseplay was unacceptable and would result in discipline. There is nothing in the written complaint or in plaintiff's deposition testimony to suggest racial overtones to the incident.

Plaintiff's other complaint to management was a claim that in Gilbert A. Odjick, a coworker and union steward, had called her a "bitch."[3] It is undisputed that, in response to her complaint, NVG imposed on Odjick a three-day disciplinary layoff on June 2, 1998, for use of abusive language. Plaintiff averred that she maintained a personal notebook contemporaneously with the various incidents; in this notebook, plaintiff referred to the incident twice, stating that

---

[3] Odjick explained that he had offered her a ride on his motorcycle, and the comment was a joking reference to her as his "motorcycle bitch."

-9-

Odjick called her a bitch; however, in her deposition testimony concerning this occurrence, plaintiff alleged for the first time that Odjick called her a "black bitch." She stated that prior to this comment, she and Odjick had been friends, but that afterwards, they stopped being friends, although she still had to talk to him at times because he was her union steward. Even accepting plaintiff's belated assertion that Odjick used a racial reference, this is an isolated incident.

Aside from the allegations regarding comments made by Zaccanelli, which will be discussed below, the record references cited by plaintiff in her Statement of Material Facts are devoid of evidence that the various incidents of which she complains are related to her race. The portions of plaintiff's deposition upon which she relies, viewed in a light most favorable to her, would not support a finding that the incidents were racially motivated. Indeed, plaintiff's testimony shows that she did not believe some incidents were racially related, and that her belief that some other incidents were racially related is based solely on speculation. For example, when asked at her deposition whether the brownie incident constituted an assault of a racial nature, she said no. She was also questioned about an incident when someone named Jimmy kicked her the back; she testified that it was not a racial assault, but rather "[h]e was under the influence of alcohol, so he was doing some karate kicks and one of them landed in my back." She testified about another occasion when one white employee, Mike, threw a hammer at another white employee. She said he wasn't throwing it at her but it almost hit her. Asked whether she thought he did it because she was black, she replied: "I think he did it because they didn't care. They didn't care, who is she?" She also stated that one Mark Karasaki, apparently a foreman, touched her on her shoulder and waist; when she was asked whether she considered it a racial assault, she stated: "Well he wasn't going around touching all the white girls, so, yeah, I would think so."

With respect to Brian Zaccanelli, plaintiff stated in her second amended complaint and her

-10-

deposition that he subjected her to racial epithets "on a daily basis." This conclusory statement is not supported by specific evidence from plaintiff or anyone else. Rather the deposition pages cited by plaintiff in her Statement of Material Facts supports, at most, a finding that Zaccanelli used a racial epithet towards plaintiff on a couple of specific occasions. Plaintiff states in her typewritten notes that he called her a "black bitch" after she reported to a supervisor that he had been hitting his machine with a hammer and that on another occasion he called her a bitch. A coworker, Patricia Glen, testified in 2004 that on <u>one occasion</u> four or five years previously, she had heard Zaccanelli use a racial epithet to plaintiff. These are the only specific allegations in the materials cited by plaintiff regarding Zaccanelli's racial epithets. It is true that plaintiff makes broad statements that she was subjected to Zaccanelli's racial epithets "on a daily basis"; however, after years of discovery and hundreds of pages of depositions, plaintiff cannot compensate for the absence of specific evidence by making unsubstantiated conclusory assertions.

Plaintiff also states that Zaccanelli would spit his tobacco in front of her and would throw items across her head or across her face when she walked past his area. Both plaintiff and Glen indicated that Zaccanelli and others engaged in "childish games," like throwing gloves, figs, candy, or chips. For the most part, the testimony from plaintiff and Glen on this topic indicates that others were throwing objects back and forth and that plaintiff and/or Glen just happened to be in the area. For example, plaintiff testified regarding Glen, "I don't think it was on purpose at first but they hit her, she threw something back and it was just like a whole all out war over there." The record does not support a finding that Zaccanelli's conduct was directed solely at plaintiff or at black employees; for example, plaintiff testified that he threatened to shoot a white employee, Joy Fragola, and that "everybody" was afraid of him. Glen testified that he was a "bully" and a "clown."

-11-

Plaintiff testified in her deposition that a coworker, Russ Liddiard, threatened her physical safety by brandishing a hammer at her. There is nothing to support a finding that this incident was related to her race. Plaintiff further claims in her second amended complaint and Statement of Material Facts that white male coworkers harassed her by leaving dead mice near her work area and objects such as blue dye in her work gloves. The deposition pages cited in her Statement of Material Facts contain no mention of dead mice, and there is no basis to find that the dye in the work gloves was related to race. She also stated that once someone placed a "rag" on the safety switch of her machine when she was not present, and that as a result she was nearly injured. She did not know who did this. When asked how she knew this incident was directed at her race, she replied: "I'm black."

According to plaintiff, on October 13, 1999, she found a note written by coworkers. She testified at her deposition that the note included a racial epithet; however, the note itself was produced and it said: "Get out we do not want you here." There is nothing in the record to support plaintiff's speculation that the note was racially-motivated.[4]

Plaintiff submits a statement by Jeffrey W. Traver; although it is notarized it is not under oath and is therefore not competent evidence. In any event, Traver's statement provides no real support for plaintiff's claim of racial harassment. Travers states that Zaccanelli "has made racist remarks directed toward Reba in front of myself and others" but gives no specifics; this

---

[4] In fact, this note was written at the time that plaintiff was reassigned from machine operator to loading operations. It is undisputed that the group was working under an incentive plan whereby one slow person affected the pay of the entire group. Plaintiff testified that the foremen told her she was being reassigned because she was holding down the earnings of her coworkers by not working up to speed. Thus, not only was there no racial reference in the note or in the surrounding circumstances, but rather the circumstances support a non-racially-related motivation.

-12-

conclusory statement is insufficient to raise a question of fact at this advanced stage in the litigation. Travers states that when he worked at NVG, he was discriminated against "because of his personal situation," that is, he needed to take leave because his wife was ill. He also states that he believes plaintiff was reassigned from her position so that it could be given to one "Ann Klein," who was "fraternizing" with the shift supervisor. In other words, he gives non-racially-related explanations for the allegedly unfair treatment meted out to him and plaintiff.

In sum, a close review of the actual evidence on which plaintiff relies to support her allegations of racial harassment reveals a dearth of objective proof of racially-related incidents. Plaintiff's contention that other black workers endured racial harassment fares as poorly; for example, she cites to the deposition of Juner Pullen as showing that Pullen's daughter, who was black, was "the victim of a hangman's noose being left on her job"; however, Pullen's own testimony is that the noose had been left not for Pullen's daughter but for a white person, and there is no evidence that the incident was racially related. The allegations, viewed in the light most favorable to plaintiff, do not amount to a showing that the workplace was permeated with discriminatory racial intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment. *See Richardson*, 180 F.3d at 436.

### *Racial harassment – imputing the conduct to NVG*

Moreover, with respect to the few incidents which arguably have racial overtones, the evidence fails to show that a specific basis exists for imputing such conduct to NVG. NVG relies on the affidavit from Quinn, stating that NVG management received only two complaints from plaintiff. Quinn states that NVG management was not aware that plaintiff was having any other problems. Plaintiff does not claim that she made any other written complaints to management.

As discussed above, in one of her two complaints to management, plaintiff claimed that

Zaccanelli had thrown a brownie at her, striking her in the back. The area manager assembled the whole department and told them that horseplay was unacceptable and would result in discipline. As noted, there is nothing in the written complaint or in plaintiff's deposition testimony about this incident to suggest that it had racial overtones or that management handled it inappropriately.

Plaintiff's other complaint to management that Gil Odjick, a co-worker and union steward, had called her a "bitch." NVG responded to plaintiff's complaint by imposing on Odjick a three-day disciplinary layoff for use of abusive language. As noted, plaintiff alleged for the first time in her deposition in this action that the term used by Odjick on that occasion was actually "black bitch." Clearly, this belated allegation of a racial reference is not a ground to impute to NVG the knowledge that Odjick had used a racial slur. Moreover, NVG dealt with the incident in a manner that cannot reasonably be considered inappropriate.

NVG submits affidavit evidence from Quinn and John Keller, NVG's Corporate Security and Fire Protection Manager, that, aside from these two complaints, management had no knowledge of the incidents alleged. In support of her allegation that she reported Zaccanelli's racial slur to NVG's management, but that NVG took no action, plaintiff's testimony is unclear and confusing, and is insufficient to raise a question of fact.[5] With respect to other incidents,

---

[5] For example, in support of her statement in her Statement of Material Facts that she "reported the behavior" of Zaccanelli to various named management people, plaintiff cites to pages 40 and 41 of her October 9, 2003 deposition. Counsel for NVG asked whether she reported to management the racial epithet she specifically alleged that Zaccanelli had made to her, she said she reported it to Odjick, some unidentified foreman, Cindy (last name unknown), and Billy Owens, "to find out what can be done," because "having to listen to that every night [was] just starting to ... drive me crazy. And they knew what they were doing and they were doing a good job of it, because they was really, really getting to the point." Counsel for NVG then asked her, "Now when you refer to they, I believe you only identified Brian Zaccanelli?" and she responded; "No. When I say they, I mean the company, the union stewards, the surrounding. I mean, it was like everybody was out to get me." At a different place in the deposition, she states that she left a note for Keller with respect to the same incident, but that he never got back to her.

-14-

plaintiff stated that she did not report the incidents when Zaccanelli would spit his tobacco in front of her and would throw items across her head or across her face when she walked past his area. With respect to her claim that Russ Liddiard threatened her physical safety by brandishing a hammer at her, the record is unclear whether and to whom she reported this. Further, on the question of reports to management, her Statement of Material Facts cites to page 80 of the October 9, 2003 deposition, in which she states that she reported the incident of the rag in the safety switch to the union steward and that she "made a report up front with Keller's secretary," whose name she did not know. With respect to her claim that Mark Karasaki touched her inappropriately, she could not remember to whom she reported it. Overall, in support of her allegation that she reported various matters to NVG's management, but no action was taken, plaintiff relies on vague, non-specific, and confusing evidence that is wholly insufficient to create a question of fact. As such, there is no competent evidence that NVG knew or should have known of the alleged harassment and did nothing to stop it. *See Richardson v. N.Y. State Dep't of Corr.* Serv., 180 F.3d 426, 441 (2d Cir.1999).

Quinn's affidavit demonstrates that NVG had a well-defined policy against racial discrimination and took immediate action to respond to racial incidents at the plant. As noted, NVG had over 3,500 hourly employees; to the limited extent that plaintiff has shown that she reported certain incidents and they were not acted upon, no inference of racial motivation can reasonably be drawn on this record. On this record, NVG has shown that it is entitled to summary judgment dismissing the racial harassment claims. Plaintiff's evidence, viewed in a light most favorable to her, does not raise a question of fact on the issue.

**Sexual harassment**

Plaintiff's Charge of Discrimination filed with the EEOC on December 9, 1999, alleged

-15-

only discrimination based on race. Thus, her sexual harassment claims are barred because they are unexhausted. Plaintiff argues that the sexual harassment claims are sufficiently related to the race-related allegations in the charge so that it would be unfair to bar the sexual harassment claims. *See Butts v. City of New York Dep't of Housing Preservation and Dev't*, 990 F.2d 1397, 1402 (2d Cir. 1993). The "sufficiently related" theory applies in three situations: (1) where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; (2) where the claim alleges an employer's retaliation for filing an EEOC charge; and (3) where a plaintiff alleges further incidents of discrimination carried out in the same manner alleged in the EEOC charge. *See id*. at 1402-03. None of plaintiff's sexual harassment claims are reasonably related to the allegations in her EEOC charge under any of these three theories. Thus, they are dismissed as unexhausted.

The Court notes also that plaintiff's claims of sexual harassment suffer from the same defects as her claims of racial harassment. For example, the deposition pages cited in plaintiff's Statement of Material Facts include her testimony that one Mark (Karasaki, Tesorik, or Trzonkowski), a foreman, touched her on her shoulder and waist. She says she reported it to his boss and maybe to Keller. Asked when this occurred, she said "perhaps" 1997. She also stated that "Alex" touched her on her shoulders and put his arm around her, and she testified: "I won't say he did it in a bad way, but he did it on too many occasions." She reported this to "whoever his boss was." She thinks it occurred in 1996. With respect to Odjick, she testified that prior to the "bitch" statement that resulted in disciplinary action in 1998, she and Odjick had been friends and that "a couple of times" he had touched her "on the shoulders." She also said he used to put his arm around her, that he was "just a touchy, touchy person," and that when she told him to stop he would apologize. She is not sure whether she reported it to anyone. Not only are plaintiff's

-16-

allegations vague and unspecific, they appear to relate to a few not severely offensive incidents over a three-year period. The allegations, viewed in the light most favorable to plaintiff, do not amount to a showing that the workplace was permeated with discriminatory sexual intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment. *See Richardson*, 180 F.3d at 436.

**State law claims**

Plaintiff's opposing papers do not address NVG's motion insofar as it seeks dismissal on the merits of her state law claims for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress and breach of contract. Thus, she is deemed to have consented to summary judgment dismissing these claims.

**Conclusion – NVG's motion**

To conclude, NVG has presented competent evidence that it is entitled to judgment as a matter of law dismissing plaintiff's claims against it. Plaintiff's submissions fail to demonstrate to the Court that there are material questions of fact barring summary judgment. Thus, even viewing the evidence in the light most favorable to plaintiff, the Court finds that summary judgment in favor of NVG is warranted.

**THE UNION'S MOTION**

**Section 1981 claim**

Plaintiff's section 1981 claim against the union avers that it failed adequately to represent her due to her race by failing to advocate for her in connection with the brownie incident, the rag-in-the-safety-latch incident, and the alleged sexual harassment by "Alex Trzonkowski." The second amended complaint also claims the union had a "system of dual representation" wherein it treated black union members different from similarly-situated white employees and that the union

-17-

was indifferent to the racial discrimination at NVG.

The union's motion for summary judgment is supported by an affidavit from plaintiff's union stewards John J. Courcy and Gilbert A. Odjick in which they respond to the allegations in the second amended complaint and set forth in detail the circumstances of their representation of plaintiff. These affidavits establish that there was no discriminatory motive to the actions taken. For essentially the same reasons discussed above in connection with related claims against NVG, plaintiff's allegations of racial discrimination by the union are without record support and fail to raise a question of fact.[6] Indeed, in her deposition, plaintiff testified that she could not recall any time when she wanted to file a grievance and the union refused to take it. Later she testified that the union refused to file a grievance in connection with her reassignment on October 14, 1999, because Odjick told her that there was nothing they could do. Odjick's and Courcy's affidavits regarding the reassignment incident explained there was no contract violation and that therefore the union could not pursue a grievance on her behalf. When asked whether she thought the reason the union did not grieve this incident was because she was female or black, she said that it was "because [she] was labeled as a troublemaker."

With respect to the alleged sexual harassment by plaintiff's supervisor Mark Trzonkowski, Odjick stated that plaintiff's complaints about Trzonkowski did not concern sexual harassment but rather his efforts – such as scrutinizing her break time – to deal with her deficient production rate. Apparently in response to this issue, plaintiff states in her Statement of Material Facts that she "attempted to report the sexual harassment of supervisor Alex [*sic*] Trzonkowski, but was

---

[6] For example, in her Statement of Material Facts she states that she "would often request union representation," and Odjick "would either fail to respond, or refuse to provide adequate representation[,]" citing to a deposition page that has nothing to do with union representation.

thwarted by ... Odjick's failure to respond despite repeated requests[,]" citing to deposition pages that have nothing to do with union representation. And plaintiff states in her Statement of Material Facts that Odjick called her a "bitch" on three occasions; again, the deposition pages cited refer only to the one incident resulting in Odjick's three-day suspension.

Viewing the facts in the light most favorable to plaintiff, the Court finds that the union has demonstrated its entitlement to dismissal of the claims against it for racial discrimination under section 1981. Plaintiff fails to demonstrate that there is evidence raising a material question of fact on the section 1981 claim. Plaintiff asserts no sex discrimination claim against the union, nor would the record support such a claim. To the extent that this cause of action may be read as alleging breach of the duty of fair representation, it is time-barred as discussed below.

**Breach of contract and breach of duty of fair representation claims**

Plaintiff's causes of action against the union for breach of its duty of fair representation are barred by the six-month limitations period applicable to such claims. *See Del Costelo v. International Brotherhood of Teamsters*, 462 U.S. 151, 169 (1983). Plaintiff does not dispute the statement in Quinn's affidavit that she has not worked for NVG since October 15, 1999. She mailed to the union a complaint dated October 20, 1999 regarding the October 14, 1999 reassignment issue. According to Odjick's and Courcy's affidavits, they had already explained to plaintiff that the reassignment did not constitute a contract violation. The union defendants were first sued in the first amended complaint (Dkt. No. 2), filed on January 4, 2001, over a year after the last incident that could possibly support these causes of action. Thus, the claims are time-barred.[7] Plaintiff cannot evade this limitation by recasting her cause of action as one for breach of

---

[7] In any event, the union's refusal to grieve an incident that did not violate the collective bargaining agreement is not a breach of its duty of fair representation.

contract.

**State law claims**

Plaintiff's opposing papers do not address the union's motion insofar as it seeks dismissal on the merits of her state law claims for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress and breach of contract. Thus, she is deemed to have consented to summary judgment dismissing these claims.

**Conclusion - the union's motion**

To conclude, the union has presented competent evidence that it is entitled to judgment as a matter of law dismissing plaintiff's claims against it. Plaintiff's submissions fail to demonstrate to the Court that there are material questions of fact barring summary judgment. Thus, even viewing the evidence in the light most favorable to plaintiff, the Court finds that summary judgment in favor of the union is warranted.

## CONCLUSION

It is therefore

ORDERED that the motion for summary judgment (Dkt. No. 101) by defendants New Venture Gear, Inc. and DaimlerChrysler Corp. is granted and the second amended complaint is dismissed in its entirety on the merits; and it is further

ORDERED that the motion for summary judgment (Dkt. No. 103) by defendants Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, Stephen Yokich as President of United Automobile, Aerospace and Agricultural Implement Workers of America  is granted and the second amended complaint is dismissed in its entirety on the merits.

IT IS SO ORDERED.

September 26, 2007
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge